# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

WILEY H. JUSTICE, M.D.,       :

     Plaintiff,             :

vs.                      :      CA 10-0624-KD-C

PROVIDENT LIFE & ACCIDENT    :
INSURANCE COMPANY, et al.,

                           :

     Defendants.


## REPORT AND RECOMMENDATION

This cause is before the Magistrate Judge for issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b), on the notice of removal (Doc. 1), plaintiff's motion to remand (Doc. 5; *see also* Doc. 6), the response in opposition filed by defendant Provident Life & Accident Insurance Company (Doc. 12),[1] plaintiff's reply (Doc. 13), and Provident's motion to strike reference to factual findings in other case (Doc. 14).[2] Upon consideration of the foregoing pleadings, the Magistrate Judge

---

[1]      Hereinafter, the removing party will be referred to as "Provident."

[2]      Plaintiff filed an opposition to the motion to strike on January 27, 2011 (Doc. 15) and Provident a reply on January 31, 2011 (Doc. 16). In entering this report and recommendation, the undersigned found no need to even read *Merrick v. Paul Revere Life Ins. Co.,* 594 F.Supp.2d 1168 (D. Nev. 2008) and certainly did not rely upon any factual findings therein. Accordingly, the undersigned deems Provident's motion to strike reference to factual findings in other case (Doc. 14) **MOOT**.

recommends that the Court **GRANT** plaintiff's motion to remand and remand this action to the Circuit Court of Mobile County, Alabama.

## FINDINGS OF FACT

1.      Sometime in 1991, defendant Edwin ("Pete") Peters approached plaintiff about purchasing a disability insurance policy (Doc. 1, Exhibit B, COMPLAINT, at ¶ 4). Dr. Justice relayed to Peters that he sought disability insurance for his specific occupation which he described as surgery of otorhinolaryngology with his exact duties being ear, nose and throat surgery. (*Id.* at ¶ 6)

> Peters represented that upon Provident's acceptance of Dr. Justice's application for insurance and premium payment, Provident would provide a disability income insurance policy for Dr. Justice's specific occupation.[3] Consistent with the training and information provided to Peters by Provident, Peters represented to Dr. Justice that if he became disabled from performing surgery, Provident would pay the disability benefits provided for in his policy. Peters represented that Provident's disability policy was a "specialty" disability policy, meaning that it would cover Dr. Justice's specialization as a surgeon and provide benefits in the event he was unable to perform surgery.[4] These representations were also made by Provident to Peters, such that Peters made these representations and assurances to Justice on his own behalf and on behalf of Provident.

---

[3]      Consistent with this allegation, Dr. Justice testified during his October 13, 2010 deposition that he told Peters that he wanted a policy which would cover him in the event he could no longer perform surgery and that Peters told him the Provident policy would cover him. (*See* Doc. 6, Deposition of Wiley Justice, M.D., at 236)

[4]      "I asked him specifically if I could no longer operate, Pete, am I covered. And his answer was, yes, this is the policy that you need that covers you when you can no longer operate." (Doc. 6, Justice depo., at 239)

(*Id.* at ¶ 7) Therefore, on July 3, 1991, plaintiff made application to Provident for disability benefits based upon his occupation as an otorhinolaryngology surgeon (Doc. 1, Exhibit C, Application).[5]

2.      Provident approved plaintiff's application for disability income insurance and issued a disability income policy, Policy No. 06-337-7066319, to him on August 6, 1991 (*Compare* Doc. 1, Exhibit B, COMPLAINT, at ¶ 8 *with id.,* Exhibit C, DISABILITY INCOME POLICY, at 3).[6]

Total Disability or totally disabled means that due to Injuries or Sickness:

1.      you are not able to perform the substantial and material duties of your occupation; and

2.      you are receiving care by a Physician which is appropriate for the condition causing the disability. We will waive this requirement when continued care would be of no benefit to you.

your occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.

(*Id.* at 4)

3.      On or about August 8, 2008, plaintiff was injured in an accident and, as a result of the accident, suffered permanent numbness in his left hand. (Doc. 1, Exhibit B,

---

[5]      Consistent with Dr. Justice's comments to Peters, on the application plaintiff described his exact duties related to his occupation as ear, nose and throat surgery. (*Id.*)

[6]      The effective date of the policy was August 1, 1991. (*See id.*)

COMPLAINT, at ¶ 11)[7] Because of the permanent numbness, Dr. Justice has been unable to perform otorhinolaryngology surgeries. (Doc. 1, Exhibit B. COMPLAINT, at ¶ 11) Therefore, on October 7, 2008, Dr. Justice submitted a claim for disability benefits to Provident. (*Id*. at ¶ 12; *see also* Doc. 6, Justice depo., at 100)[8] Plaintiff's description of his injury on the October 7, 2008 claim form was "cervical fracture with cord compression and nerve damage due to mountain biking accident in Park City, Utah, on August 8, 2008[.]" (*Id*. at 101-102)[9] Thereafter, in a supplemental statement submitted to Provident on November 20, 2008, Dr. Justice acknowledged that he began seeing patients in clinic again on August 28, 2008 diagnosing and treating ear, nose and throat illnesses but that he was unable to perform surgery in his "recognized specialty of otolaryngology[.]" (Doc. 6, CLAIMANT'S SUPPLEMENTAL STATEMENT) By way of further explanation, Dr. Justice stated that he scheduled surgery on two occasions after his accident under the supervision of one of his partners, Dr. John Wilson, and

---

[7]     Dr. Justice had an accident while mountain biking in Utah on August 8, 2008. (*See* Doc. 6, Justice depo., at 96-98) Plaintiff fell on the top of his head and broke his neck. (*Id*. at 97) He returned to Mobile by air on August 10, 2008; Dr. Brent Faircloth performed surgery on August 11, 2008. (*See id*. at 98)

[8]     Provident actually received a call from the assistant to Pete Peters, Shannon, on August 12, 2008, advising the company of Dr. Justice's accident. (*See id*. at 198-199)

[9]     On October 7, 2008, Dr. Faircloth filled out an attending physician's statement for Provident which restricted plaintiff from performing operations and noted that plaintiff was limited with respect to coordinated movement with the left hand/arm. (*See id*. at 195-196) All other statements completed by Dr. Faircloth at Provident's behest contained the same restrictions and limitations. (*See id*. at 196-197)

determined that it was in the best interests of his patients that he "cease performing surgery." (*Id.*)

4.    Provident notified Dr. Justice by letter dated January 6, 2009, that it was denying his claim for total disability benefits. (Doc. 1, Exhibit E) This letter reads, in relevant part, as follows:

> We received a letter from Attorney Shirley Justice dated October 9, 2008 stating that she is representing you. We have spoken previously with Attorney Justice regarding your claim and we would like to take this opportunity to request confirmation from you as to Attorney Justice's involvement with your claim. If Attorney Justice or other legal council (sic) is representing you for this claim, we ask that you provide our office with a statement verifying this representation.
>
> At this time, we are writing to update you on the status of your claim for Total Disability benefits.
>
> Our medical department has recently completed a review of your file. Our clinician, who reviewed the file, stated that the medical documentation supports restrictions and limitations for your fine motor skills and pushing/pulling at this time with your left hand.
>
> ***Our vocational department has also recently completed a review of the CPT reports provided to our office****. In 2007, you had total charges of $1,699.757.74 with average monthly charges of $141,646. **Surgical procedures represented 24% of total charges***. ***In the months of 2008 prior to your accident, 26% of total charges were from surgical procedures***.
>
> ***Based on review of your CPT reports, we determined that you performed the duties of an ENT physician with a surgical component to your practice prior to your accident. Your duties included seeing patients in the office for exams and performing surgical procedures as needed. The performance of surgical procedures was not the only duty of your occupation.***
>
> You reported that you returned to work on August 28, 2008. As such, we also reviewed CPT reports for September and October 2008 to determine the duties you are currently performing. In September 2008 and October 2008, your charges were $64,801.95, and $125,368.82, respectively. ***In***

*September surgical charges accounted for 13% of total charges and in October surgical charges accounted for 6% of total charges.*

*In the period prior to your accident, the ten surgical procedures that accounted for the highest number of charges included create eardrum opening, remove tonsils and adenoids, removal of tonsils, diagnostic laryngoscopy, repair of nasal septum, resect inferior turbinate, remove impacted ear wax, clean out mastoid cavity, and control of nosebleed. Of these, the only two procedures which you did not perform in September and October 2008 were repair of nasal septum and resect inferior turbinate.*

.     .     .

*The substantial and material duties of your occupation include seeing patients in the office for exams and performing surgical procedures as needed. Review of CPT reports for September and October of 2008 reflect that you have returned to seeing patients in the office for exams and performing some surgical procedures. As such, you have not satisfied the Total Disability terms of your policy.*

(Doc. 1, Exhibit E (emphasis supplied))[10]

5.      On June 18, 2009, Dr. Justice penned a letter to Provident (Doc. 1, Exhibit D), same reading, in relevant part, as follows:

I am writing in response to your letters of April 3, 2009, as well as May 12, 2009. There are several matters that need clarification, and I would ask that you reconsider your determination that I am not disabled as defined by my disability insurance policy.

.     .     .

_____

[10]      A Senior Disability Benefits Specialist for Provident, Rebecca Brower, penned the total disability denial letter to Dr. Justice. (*See id*.) On January 26, 2009, Brower and Dr. Justice spoke by phone. (Doc. 6, Justice depo., at 205) Brower's notes from that conversation reflect that Dr. Justice informed Brower that he could not perform "invasive procedures[.]" (*Id*.) Provident sent several letters to Dr. Justice during the period February 5, 2009 through May 12, 2009 which went unanswered until Dr. Justice penned a letter dated June 18, 2009 in response to the latter two letters from Provident. (*Compare id.* at 207-209 *with* Doc. 1, Exhibit D)

[Y]our May 12, 2009 letter reiterates UNUM's position that I am not disabled based upon a two-month examination of my CPT code reports. A fair and thorough analysis of my claim does not support your conclusion for a number of reasons. First, a CPT code analysis, standing alone, does not provide an accurate assessment of the material duties of my occupation. Your CPT code review does not take into account that consultations, reviews, or follow up work may not be generated by a surgeon who is not performing surgery. Further, simply because a CPT code may be classified as being "surgical" does not mean that a physician is able to perform the material duties of his occupation.

Despite the inherent limitations and impropriety of limiting your claim review solely to a CPT code analysis, because you have asked for CPT code reports from December 2008 to the present, copies of those reports are enclosed herein.

In your correspondence, you noted that I continued to perform certain surgical procedures after returning to work in September of 2008. As I noted in my reports to UNUM, there were two (2) occasions after I returned to work when I attempted to perform surgical procedures. On these occasions, another surgeon was present to assist and provide medical oversight. After these attempts, in consultation with my personal physician and my partners, I concluded that I could no longer safely perform surgery because of my injuries. Since that time, I have not performed surgery. Further, because of my physical limitations and inability to perform surgery, my partners have not included me in any call rotations since the date of my accident.

At the time I applied for and obtained my disability benefits policy, I indicated that my occupation was the "surgery of otolaryngology." My application discloses that my duties were "ear, nose and throat surgery." The policy provides that my occupation means that which I was regularly engaged in at the time I became disabled. At the time of my disability, I was a surgeon. Under the definition of my policy and based on the representations made to me at the time I purchased my policy, I was said to be totally disabled if I were (sic) not able to perform the substantial and material duties of my occupation, which are those of a surgeon. I am no longer able to perform surgery, which is the substantial and material duty of my occupation. The fact that I am able to consult with patients and otherwise practice medicine is irrelevant under the terms and conditions of the policy which your company drafted and provided to me, and with respect to which they have continued to collect premiums from me[] since 1991.

Finally, let me make clear that I have not made a claim for residual benefits under my disability insurance policy. Consequently, I have not asked for UNUM to review or adjust such a claim. In light of the fact that there is no claim for residual benefits now pending, it would not appear that my income records are relevant to the claim that has been made. If you can explain to me the relevancy of those documents, I will be glad to provide them to you.

Based on the foregoing, I would ask UNUM to fully and completely investigate and adjust my claim for total disability benefits under my policy and pay the benefits due me under that policy.

(Doc. 1, Exhibit D)

6. By letter dated June 26, 2009, Provident requested plaintiff complete an additional job description and informed him that it was going to follow-up with his employer, Premier, to obtain additional information. (*See* Doc. 6, Justice depo., at 212) Provident also requested updated medical records from Dr. Justice's treating providers and the insurance company evaluated the CPT codes submitted by plaintiff with his June 2009 letter. (*Id*. at 213)

7. Provident sent plaintiff a letter dated August 6, 2009 which noted, among other things, that the policy required ongoing proof of loss and a letter dated September 11, 2009 again advising Dr. Justice that he had not satisfied the total disability provisions of the policy but that he could be eligible for residual benefits. (*Id*. at 214)

8. Plaintiff filed this fraudulent misrepresentation, fraudulent nondisclosure, breach of contract, bad faith refusal to pay valid insurance claims, and bad faith failure to investigate action against Provident and Pete Peters in the Circuit Court of Mobile

County, Alabama on February 3, 2010. (Doc. 1, Exhibit B, COMPLAINT)[11] Other than as set forth above, the complaint reads, in relevant part, as follows:

12.   . . . Despite the fact that Dr. Justice is disabled from performing his specified occupation, Provident has refused to pay the benefits that Dr. Justice is due under his policy. Contrary to the representations made to Justice at the time of the sale of the policy, Provident interprets the policy of insurance as to only provide coverage in the event that Justice cannot perform all of the duties of his occupation, even though he no longer performs surgery.

13.   Defendants' conduct, including the misrepresentations of material facts and failure to disclose material facts which included the fraudulent practice on Plaintiff, are a part of a pattern and practice of fraudulent conduct by these Defendants. Provident's refusal to pay disability benefits is a pattern and practice of bad faith conduct by Provident which it has engaged in with numerous other similarly-situated policyholders like Dr. Justice.

## COUNT ONE

### (Fraudulent Misrepresentation)

14.   Plaintiff adopts and realleges all prior paragraphs of this Complaint as if set out fully herein.

15.   In light of Provident's interpretation of Dr. Justice's disability income policy (which directly conflicts the policy's plain language and the representations made to him at the time of sale), Defendants' aforesaid representations were false and (a) Provident knew that they were false or (b) Provident, without knowledge of the true facts, recklessly and/or negligently misrepresented the true facts and (c) further, Defendant Peters made said representations by mistake, but with the intention that Plaintiff should rely on these facts.

---

[11]   Plaintiff later amended his complaint to assert a sixth cause of action against Provident, namely that the defendant's breach of contract is a continuing breach. (Doc. 1, Exhibit B, AMENDED COMPLAINT)

16.     Plaintiff believed the representations, and in reasonable reliance on them, purchased the disability income policy from the Defendants.

17.     As a proximate result of the aforesaid fraud, Plaintiff incurred the following injuries and damages:

(a)     Plaintiff is totally disabled from performing his occupation, but has no disability income benefits for his disability;

(b)     Plaintiff has lost the value of his premium payments;

(c)     Plaintiff has paid sums of money to Defendants in insurance premiums, but did not receive the value of the policy as represented;

(d)     Plaintiff is entitled to past and future disability income payments;

(e)     Plaintiff has suffered other economic injuries including out of pocket expenses, and loss of income; and

(f)     Plaintiff has incurred mental anguish and emotional distress.

WHEREFORE, Plaintiff demands judgment against Provident in an amount of compensatory and punitive damages and Peters for compensatory damages, as will be determined by a jury at a trial of this cause, plus interest and costs.

## COUNT TWO

### (Fraudulent Nondisclosure)

18.     Plaintiff adopts and realleges all prior paragraphs of this Complaint as if set out fully herein.

19.     The Defendants fraudulently failed to disclose to the Plaintiff the following material facts which the Defendants were under a duty to disclose:

(a)     That Provident would not pay disability income benefits when Dr. Justice was permanently and totally disabled from

performing his recognized specialty, i.e., otorhinolaryngology surgery;

(b)     That Provident has been and continues to engage in a pattern and practice of conduct that results in a bad faith refusal to pay and to investigate disability income benefit claims, such as Dr. Justice's claim;

(c)     That Defendants' policy was not a "specialty" disability policy that paid disability income benefits for a specialty like Dr. Justice's.

20.     As a proximate result of the Defendants' fraudulent suppression as aforesaid, Plaintiff was injured and damaged as follows:

(a)     Plaintiff is totally disabled from performing his occupation with no disability income coverage for that condition;

(b)     Plaintiff has lost the value of his premium payments;

(c)     Plaintiff has paid sums of money to Defendants in insurance premiums, but did not receive the value of the policy as represented;

(d)     Plaintiff has suffered other economic injuries including out of pocket expenses, and loss of income; and

(e)     Plaintiff has incurred mental anguish and emotional distress.

WHEREFORE, Plaintiff demands judgment against Provident in an amount of compensatory and punitive damages and Peters for compensatory damages, as will be determined by a jury at a trial of this cause, plus interest and costs.

(*Id.* at ¶¶ 12-20)

9.     Provident answered plaintiff's complaint on or about March 11, 2010 (*see*

Doc. 1, Exhibit B, Provident's ANSWER) and defendant Pete Peters answered the

complaint on or about April 5, 2010 (*see id.*, Peters' ANSWER). The removing

defendant, who was served with the complaint sometime in February 2010 (*see* Doc. 1, Exhibit B), did not remove this action within thirty (30) days of its receipt of the complaint  but, instead, removed it within thirty (30) days of the taking of Dr. Justice's deposition (*compare* Doc. 1, at 1 (action removed on November 12, 2010)  *with id.* at ¶ 2 ("On October 13, 2010, Provident deposed the Plaintiff and obtained testimony which forms the basis of this removal.")). Accordingly, this action was removed by Provident to this Court in accordance with the second paragraph of § 1446(b) (*see id.* at ¶ 2). Provident asserts in the removal petition that "Dr. Justice's deposition testimony demonstrates that there is no evidence that would support a finding that there is a reasonable possibility of recovery on Plaintiff's misrepresentation claim against Peters because Peters' representations were not false and/or were not reasonably relied upon by Plaintiff and/or were not the proximate cause of Plaintiff's alleged injuries" (*id.* at ¶ 15) and, further, that "based upon his deposition testimony, Dr. Justice cannot prevail on his claim of nondisclosure against Peters." (*Id*. at ¶ 35)

      10.     Plaintiff filed his motion to remand on December 10, 2010. (Doc. 5) Therein, plaintiff contends that Provident's removal is procedurally deficient in that "the notice of removal was untimely because it was not 'filed within thirty days after the receipt by the defendant . . . of a copy of the initial pleading.'" (*Id*. at 2, quoting 28 U.S.C. § 1446(b)) In addition, it is plaintiff's position that Provident has not satisfied its burden of proving "'by clear and convincing evidence . . . that there is "*no possibility*" that [the plaintiff] "can establish a cause of action against the resident defendant."'" (*Id.* at 1, quoting *Henderson v. Washington Nat'l Ins. Co.,* 454 F.3d 1278, 1283 (11th Cir.

2006)) Provident filed its response in opposition on January 10, 2011. (Doc. 12) The removing defendant argues that its removal was timely because Dr. Justice disclosed new information in his deposition that revealed Peters was fraudulently joined. As the undersigned appreciates Provident's argument, the new evidence consists of the deponent's admission that the actual duties of his occupation "both at the time he applied for coverage in 1991 and at the time of his accident in 2008, included far more than just surgery." (Doc. 12, at 3) Thereafter, defendant's response in opposition hinges on its argument that Dr. Justice has no valid fraud claims against Peters because he cannot show he reasonably relied upon any alleged misrepresentations. (*See id*. at 2-13) Plaintiff filed his reply brief on January 24, 2011 contending that defendant's response establishes that its removal was untimely since it is obvious that surgeons do many things other than cut and that Provident was not ignorant of this basis of removal at the time of the taking of Justice's deposition such that removal was improvident under the second paragraph of § 1446(b). (Doc. 13, at 2) More substantively, plaintiff contends that Provident is attempting to turn "the standard for fraudulent joinder completely on its head" by arguing that "if a defendant can concoct a defense to a fraud claim, no matter how implausible, then the plaintiff has fraudulently joined the resident defendant who allegedly committed the fraud." (*Id*. at 3; *see also id.* at 2-11)

## CONCLUSIONS OF LAW

### A.    Jurisdiction in General.

1.    There can be no doubt but that "[f]ederal courts are courts of limited jurisdiction, and there is a presumption against the exercise of federal jurisdiction, such

that all uncertainties as to removal jurisdiction are to be resolved in favor of remand."

*Russell Corp. v. American Home Assurance Co.*, 264 F.3d 1040, 1050 (11th Cir. 2001)

(citation omitted); *see also Allen v. Christenberry*, 327 F.3d 1290, 1293 (11th Cir.)

("[R]emoval statutes should be construed narrowly, with doubts resolved against

removal."), *cert. denied*, 540 U.S. 877, 124 S.Ct. 277, 157 L.Ed.2d 140 (2003);

*University of South Alabama v. American Tobacco Co.*, 168 F.3d 405, 411 (11th Cir.

1999) ("Because removal jurisdiction raises significant federalism concerns, federal

courts are directed to construe removal statutes strictly. . . . Indeed, all doubts about

jurisdiction should be resolved in favor of remand to state court."); *see Kokkonen v.

Guardian Life Ins. Co. of America*, 511 U.S. 375, 377, 114 S.Ct. 1673, 1675, 128

L.Ed.2d 391 (1994) ("Federal courts are courts of limited jurisdiction. They possess only

that power authorized by Constitution and statute, which is not to be expanded by judicial

decree[.]" (internal citations omitted)). Moreover, the removing defendant must bear "the

burden of demonstrating federal jurisdiction." *Triggs v. John Crump Toyota, Inc.*, 154

F.3d 1284, 1287 n.4 (11th Cir. 1998) (citation omitted); *see also McCormick v. Aderholt*,

293 F.3d 1254, 1257 (11th Cir. 2002) ("[T]he party invoking the court's jurisdiction

bears the burden of proving, by a preponderance of the evidence, facts supporting the

existence of federal jurisdiction.").  Stated differently, because federal courts are courts

of limited jurisdiction "[i]t is . . . presumed that a cause lies outside this limited

jurisdiction, and the burden of establishing the contrary rests upon the party asserting

jurisdiction[.]" *Kokkonen, supra*, 511 U.S. at 377, 114 S.Ct. at 1675 (internal citations

omitted).

2.     Where, as here, jurisdiction is predicated on diversity of citizenship pursuant to 28 U.S.C. § 1332 (*see* Doc. 1, at ¶ 5 ("This removal is based on diversity jurisdiction. 28 U.S.C. § 1332."))[12] the removing party, Provident, bears the burden of establishing complete diversity of citizenship, that is, that the plaintiff is diverse from all the defendants, *Triggs, supra*, 154 F.3d at 1287 (citation omitted), and, in addition, must establish by a preponderance of the evidence that the amount in controversy more likely than not exceeds the $75,000 jurisdictional requirement, *Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1357 (11th Cir. 1996) ("[W]e hold where a plaintiff has made an unspecified demand for damages in state court, a removing defendant must prove by a preponderance of the evidence that the amount in controversy more likely than not exceeds the $[75,000] jurisdictional requirement."), *abrogated on other grounds by Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir. 2000). Moreover, as a procedural matter, the removal must be timely. *See, e.g., Clingan v. Celtic Life Ins. Co.*, 244 F.Supp.2d 1298, 1302 (M.D. Ala. 2003) ("The time limit in 28 U.S.C. § 1446(b) is 'mandatory and must be strictly applied.'"); *cf. Moore v. North America Sports, Inc.,* 623 F.3d 1325, 1329 (11th Cir. 2010) ("[T]he timeliness of removal is a procedural defect-not a jurisdictional one.").

3.     As a threshold matter, the undersigned first considers whether Provident's removal of this case was timely. *See Clingan, supra* ("[Provident], as the party bearing

---

[12]     Federal courts may exercise diversity jurisdiction over all civil actions where the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states. 28 U.S.C. § 1332(a)(1).

the burden of proving federal jurisdiction, also has the task of proving to the court exactly when the thirty day time limit of 28 U.S.C. § 1446(b) began to run."). Thereafter, even though the undersigned agrees with plaintiff that Provident did not timely remove this case, this opinion also considers whether Provident has established by clear and convincing evidence that defendant Peters was fraudulently joined to defeat diversity of citizenship.

**B.** **Whether this Action was Timely Removed—The First and Second Paragraphs of 28 U.S.C.§ 1446(b).**

4.     The procedure for removal of a civil action is governed by § 1446(b) which generally provides, in its first paragraph, that the notice of removal must be filed within 30 days after service of the initial pleading "setting forth the claim for relief" but also provides, in its second paragraph, that "[i]f the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable[.]" 28 U.S.C. § 1446(b). Therefore, "the statutory framework provides for a two-pronged analysis for removal, to-wit: '[I]f the case stated by the initial pleading is removable, then notice of removal must be filed within thirty days from the receipt of the initial pleading by the defendant. . . . [I]f the case stated by the initial pleading is not removable, then notice of removal must be filed within thirty days from the receipt of . . . other paper from which the defendant can ascertain that the case is removable.'" *Holloway v. Morrow*, 2008 WL 401305, *2 (S.D. Ala. Feb. 11, 2008), quoting *Chapman*

*v. Powermatic, Inc.,* 969 F.2d 160, 161 (5th Cir. 1992). As aforesaid, the time limit set forth in § 1446(b) "'is mandatory and must be strictly applied.'" *Id.,* quoting *Clingan v. Celtic Life Ins. Co.,* 244 F.Supp.2d 1298, 1302 (M.D. Ala. 2003). In addition, it is clear that "the 30-day removal period prescribed by § 1446(b) commences running as soon as a defendant is able to ascertain intelligently that the action is removable." *Id.* at *3 (citations omitted); *see also Clingan, supra,* 244 F.Supp.2d at 1302 ("[T]he 'plain purpose of [the] language [of 28 U.S.C. § 1446(b)] "is to permit the removal period to begin only after the defendant is able to ascertain intelligently that the requisites of removability are present."'"); *Moore v. Allstate Indemnity Co.,* 2006 WL 2730743, *4 (S.D. Ala. Sept. 22, 2006) ("The defendants were not required to remove based solely on the complaint unless they 'could have intelligently ascertained that the action was removable' before receiving the plaintiff's discovery response.").

5.    In *Pretka v. Kolter City Plaza II, Inc.,* 608 F.3d 744 (2010), a panel of the Eleventh Circuit reiterated the need for promptness[13] in removal under both paragraphs of § 1446(b) and explained that the road offered for defendants in the second paragraph is not an easy one to travel particularly since the word "ascertained" in that paragraph is much different from the language contained in the first paragraph. *See id.* at 760.

> "Setting forth," the key language of the first paragraph, encompasses a broader range of information that can trigger a time limit based on notice than would "ascertained," the pivotal term in the second paragraph. To "set

---

[13]    As also previously indicated, timeliness "is not a jurisdictional issue." *Id.* at 751 (citations omitted); *see also In re Uniroyal Goodrich Tire Co.,* 104 F.3d 322, 324 (11th Cir. 1997) ("The untimeliness of a removal is a procedural, instead of a jurisdictional, defect.").

> forth" means to "publish" or "to give an account or statement of."
> "Ascertain" means "to make certain, exact, or precise" or "to find out or
> learn with certainty." The latter, in contrast to the former, seems to require
> a greater level of certainty or that the facts supporting removability be
> stated unequivocally.

*Id*., quoting *Bosky v. Kroger Tex., LP,* 288 F.3d 208, 211 (5th Cir. 2002). This language

is important not only because it indicates a partial misuse of the word "ascertain" in

*Holloway, Clingan*, and *Moore, supra,* but also because, as noted in *Pretka*, it is a

reminder to district courts that the first paragraph of § 1446(b) provides a much wider

entry into federal court than does the second paragraph of that section. *See id*. This is, in

turn, partially because the first paragraph of § 1446(b) does not "restrict the type of

evidence that a defendant may use to satisfy the jurisdictional requirements for removal."

*Id.* at 771; *see also id.* at 759 (a removing defendant can offer its "own affidavits or other

evidence to establish federal removal jurisdiction[,]"); *id*. at 755 & 756 ("The substantive

jurisdictional requirements of removal do not limit the types of evidence that may be used

to satisfy the preponderance of the evidence standard. Defendants may introduce their

own affidavits, declarations, or other documentation-provided of course that removal is

procedurally proper. . . . The other circuit courts of appeal that have addressed the issue

agree with our circuit law that defendants may submit a wide range of evidence in order

to satisfy the jurisdictional requirements of removal. . . . No court of appeals decision we

could find holds that a defendant may not submit its own evidence in order to satisfy the

jurisdictional requirements of removal, and we conclude that the defendant can."); *id*. at

761 ("*Lowery's* 'receipt from the plaintiff' rule has no application to cases, like this one,

which are removed under the *first* paragraph of § 1446(b).").

6. With these principles in mind, the undersigned considers and finds compelling plaintiff's argument that Provident untimely removed this case to this Court because it did not remove the case within 30 days of service of the summons and complaint. The undersigned recommends that the Court remand this case to the Mobile County Circuit Court based on the untimely removal by the defendant inasmuch as it is the undersigned's determination that Provident could have intelligently determined that this case was removable within thirty days of service of the summons and complaint.

7. In reaching this determination, the undersigned considers Provident's contention that what it learned during Dr. Justice's deposition allowing it to remove this action when it did was that plaintiff's "actual duties, both at the time he applied for coverage in 1991 and at the time of his accident in 2008, included far more than just surgery[,]" (Doc. 12, at 3; *see also id*. at 3-9) contrary to the information provided Provident when application for insurance was made in 1991 and upon making his claim in 2008 (*id*. at 2). It is Provident's position that until it had this information, it could not make the argument that plaintiff could not have reasonably relied on any alleged misrepresentation by Peters (*see id*. at 2-13). Contrary to the arguments of the removing party, the undersigned finds that Provident had the very information it contends it lacked, or at the very least could have intelligently determined same, at the time the complaint was filed and, therefore, it should have removed this case within thirty (30) days of the filing of the complaint and made its fraudulent joinder argument at that time. *Clingan, supra,* 244 F.Supp.2d at 1303 (finding that a removing party "cannot base the timing of its notice of removal on information allegedly obtained for the first time in a deposition

when it legally possessed that information at an earlier date."); *see also Holloway, supra,* at *3 n. 4 ("[A] defendant cannot piggyback the § 1446(b) 30-day period on receipt of discovery responses containing information that it already possessed."); *Mendez v. Central Garden & Pet Co.,* 307 F.Supp.2d 1215, 1217 (M.D. Ala. 2003) ("The defendant 'cannot base the timing of its notice of removal on information allegedly obtained for the first time in a deposition when it legally possessed that information at an earlier date.'").

Although Provident argues that it did not know prior to Dr. Justice's October 13, 2010 deposition that his actual duties, both at the time he applied for coverage in 1991 and at the time of his accident in 2008, included far more than just surgery, such argument need be rejected given that these very facts served as the basis for Provident rejecting plaintiff's claim for total disability. As reflected by Provident's correspondence with Justice in January of 2009, the removing party's analysis of CPT codes provided by plaintiff's employer revealed that the performance of surgical procedures was not the only duty of Dr. Justice's occupation. In fact, such review gave Provident clear indication that "substantial and material duties of [Dr. Justice's] occupation included seeing patients in the office for exams and performing surgical procedures as necessary[,]" (Doc. 1, Exhibit E) such that Dr. Justice, in Provident's opinion, could not satisfy the total disability terms of his policy.[14]

---

[14]  Given plaintiff's representations on his application form that his occupation was "surgery of otorhinolaryngology" (with specific duties being ear, nose and throat surgery) and the consistent averments in the complaint that Dr. Justice told Peters that he sought disability for his specific occupation, that is, surgery of otorhinolaryngology, with his exact duties being ear, nose, and throat surgery (Doc. 1, Exhibit B, COMPLAINT, at ¶ 6), Provident certainly could (Continued)

8.      In light of and based upon the foregoing, Prudential could have, within thirty (30) days of service of the summons and complaint, made the argument that plaintiff fraudulently joined Peters to defeat diversity jurisdiction since the removing defendant was well aware when the complaint was filed that the duties of plaintiff's occupation at all times consisted of more than simply performing surgery on his patients. The evidence in Prudential's possession establishing this fact (e.g., letters, CPT codes, CPT-code analysis, etc.), certainly could have been attached to a properly-filed removal petition within thirty days of service of the complaint.[15] Because Provident could have and should have intelligently determined that the case stated by the complaint was removable and traveled the broader access provided by the first paragraph of § 1446(b) to bring this case into this Court within thirty days of service of the complaint, its action in waiting until thirty days after plaintiff's deposition to remove this case necessitates remand to the Circuit Court of Mobile County, Alabama based upon untimely removal.

C.      **Whether Complete Diversity of Citizenship Exists**.

9.      Even if it is determined that Provident's notice of removal was somehow compliant with the temporal restrictions of  28 U.S.C. § 1446(b), remand would remain appropriate for lack of subject matter jurisdiction.

---

have intelligently determined that the discussions between plaintiff and Peters did not specifically touch on any other duties performed by Justice.

[15]      Even if Provident would have hesitated in simply attaching this evidence to the removal petition, it could have appended these documents to an appropriate affidavit.

10.     As previously indicated, the diversity statute, 28 U.S.C. § 1332, demands complete diversity, such that plaintiff may not be a citizen of the same state as any defendant. *See, e.g., Florence v. Crescent Resources, LLC,* 484 F.3d 1293, 1297 (11th Cir. 2007) (recognizing "necessary corollary" of diversity jurisdiction that "complete diversity of citizenship" is required); *Legg v. Wyeth*, 428 F.3d 1317, 1320 n.2 (11th Cir. 2005) ("28 U.S.C. § 1332 requires 'complete diversity'-the citizenship of every plaintiff must be diverse from the citizenship of every defendant.").[16]

11.     "Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity." *Triggs, supra,* 154 F.3d at 1287. Notwithstanding the complete diversity requirement, a non-diverse defendant who is fraudulently joined does not destroy jurisdiction because his citizenship is excluded from the diversity equation. Under well-settled law, a finding of fraudulent joinder is appropriate in circumstances presented here only if "'there is *no possibility* the plaintiff

---

[16]     Mere diversity, in and of itself, is not sufficient to create jurisdiction under § 1332 since "the court is obligated to assure itself that the case involves the requisite amount in controversy." *Morrison v. Allstate Indemnity Co.*, 228 F.3d 1255, 1261 (11th Cir. 2000) (citations omitted). There is no need for this Court to address the amount in controversy requirement, however, since the diversity issue is dispositive of the motion to remand. Moreover, even had such need arisen, the undersigned would have only to note that plaintiff, for good reason, makes no argument that the amount in controversy element is not met in this case. (*Compare* Doc. 6 *and* Doc. 13 (no argument regarding the amount in controversy) *with* Doc. 1, Exhibit F, Declaration of Rebecca Brower, at 1-2 ("[Dr. Justice's disability insurance policy issued by Provident] pays benefits on a monthly basis contingent upon ongoing proof of disability on a monthly basis. The Policy contains a 90-day elimination period. Had Dr. Justice satisfied the Policy's requirements regarding total disability, the maximum monthly base benefit for total disability would have been $6,140.00. At that rate, assuming an August 8, 2008 accident, Dr. Justice would have been owed a total of approximately $147,360.00 (24 x $6,140.00) for the period from November 2008 through November 2010, had he qualified for total disability benefits during that period."))

can establish a cause of action against the resident defendant.'" *Henderson v. Washington Nat'l Ins. Co.,* 454 F.3d 1278, 1281 (11th Cir. 2006) (emphasis supplied; citation omitted); *see also Florence, supra,* 484 F.3d at 1299 ("[I]f there is any possibility that the state law might impose liability on a resident defendant under the circumstances alleged in the complaint, the federal court cannot find that joinder of the resident defendant was fraudulent, and remand is necessary."); *Triggs,* 154 F.3d at 1287 ("'If there is *even a possibility* that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court.'"). Thus, "[t]he plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a *possibility* of stating a valid cause of action in order for the joinder to be legitimate." *Id.* (citation omitted); *see also Pacheco de Perez v. AT & T Co.,* 139 F.3d 1368, 1380 (11th Cir. 1998) ("Where a plaintiff states even a colorable claim against the resident defendant, joinder is proper and the case should be remanded to state court.").

12.     "The determination of whether a resident defendant has been fraudulently joined must be based upon the plaintiff's pleadings at the time of removal, supplemented by any affidavits and deposition transcripts submitted by the parties. . . . In making its determination, the district court must evaluate factual allegations in the light most favorable to the plaintiff and resolve any uncertainties about the applicable law in the plaintiff's favor." *Pacheco de Perez*, 139 F.3d at 1380 (citations omitted); *see also Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997) ("To determine whether the case should be remanded, the district court must evaluate the factual allegations in the

light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff. . . . The federal court makes these determinations based on the plaintiff's pleadings at the time of removal; but the court may consider affidavits and deposition transcripts submitted by the parties."); *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1561 (11th Cir. 1989) ("In addressing the issue of fraudulent joinder, the district court should resolve all questions of fact and controlling law in favor of the plaintiff and can consider any submitted affidavits and/or deposition transcripts.").

> While "the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed.R.Civ.P. 56(b)," the jurisdictional inquiry "must not subsume substantive determination." Over and over again, we stress that "the trial court must be certain of its jurisdiction before embarking upon a safari in search of a judgment on the merits."

*Crowe, supra*, 113 F.3d at 1538 (internal citations omitted).

13.     "In a fraudulent joinder inquiry, 'federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law.'" *Pacheco de Perez*, 139 F.3d at 1380-1381 (quoting *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997)).

> In terms of this circuit's law, the main point for us is this one: For a Plaintiff to present an arguable claim against an in-state defendant and, therefore, to require a case removed to federal court to be remanded to state court, the plaintiff need not show that he could survive in the district court a motion for summary judgment filed by that in-state defendant. For a remand, the plaintiff's burden is much lighter than that: after drawing all reasonable inferences from the record in the plaintiff's favor and then resolving all contested issues of fact in favor of the plaintiff, there need only be "a reasonable basis for predicting that the state law *might* impose liability on the facts involved." Because the procedures are similar while the substantive standards are very different, district courts must exercise

extraordinary care to avoid jumbling up motions for remand and motions for summary judgment that come before them.

In the remand context, the district court's authority to look into the ultimate merit of the plaintiff's claims must be limited to checking for obviously fraudulent or frivolous claims. Although we have said that district courts may look beyond the face of the complaint, we emphasize that the district court is to stop short of adjudicating the merits of cases that do not appear readily to be frivolous or fraudulent.

*Crowe*, 113 F.3d at 1541-1542 (internal citations omitted).

14.     Because a removing defendant must show by clear and convincing evidence that there is no possibility the plaintiff can establish a cause of action against the resident defendant, *Henderson,* 454 F.3d at 1281, it is no surprise that courts describe the burden on the removing party to prove fraudulent joinder as a "heavy one." *Crowe,* 113 F.3d at 1538 (citation omitted).

15.     Since Justice and Peters are Alabama citizens for diversity purposes, Provident predicates removal jurisdiction under § 1332 on its argument that Peters' citizenship does not count in the diversity analysis since he was fraudulently joined. More specifically, Provident has distilled its argument to the following: plaintiff cannot maintain his fraud claims against the resident defendant inasmuch as he cannot show that he reasonably relied upon any alleged misrepresentations by Peters. (Doc. 12; *compare id. with* Doc. 1)[17] In turn, Provident contends that there could have been no reasonable

---

[17]     "'The elements of fraud are: (1) a misrepresentation of a material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) that was reasonably relied on by the plaintiff under the circumstances, and (4) that caused damage as a proximate consequence.'" *Allstate Ins. Co. v. Eskridge*, 823 So.2d 1254, 1258 (Ala. 2001) (citation omitted). The Alabama Supreme Court, in a recent case, reiterated that where a plaintiff asserts (Continued)

reliance on any alleged misrepresentations by Peters given Justice's deposition testimony that he did not proactively tell Peters when he was procuring the insurance that the duties of his occupation included much more than simply performing surgery and, instead, that the bulk of those duties involved the medical treatment of patients presenting with ENT maladies without need of surgical intervention. (*See, e.g.,* Doc. 12, at 3-5)    The undersigned declines Provident's offer to go down this path. The acceptance of such argument on removal would ignore not only that this litigation arises out of the purchase of a "specialty" or "special occupation" disability policy, plaintiff's specialty at the time of purchase being an otorhinolaryngology surgeon, which Peters told Justice would pay if he could no longer operate but, as well, the reasonable inference from Justice's testimony that Peters fully appreciated that plaintiff's duties involved much more than just the performance of surgery given that Peters and other members of Peters' family were plaintiff's patients (*see* Doc. 6, Justice depo., at 228 ("Mr. Peters was a business acquaintance of my wife, and I was introduced to him through her. And he subsequently became a patient of mine. I treated he and his wife and kids. He was a friend.")).   While the undersigned fully appreciates Provident's "defense" that Justice did not proactively tell Peters about his other duties, and, therefore, could not have reasonably relied on

―――――――――――――――

fraudulent misrepresentation and suppression claims, as Justice does here (Doc. 1, Exhibit B, COMPLAINT, at ¶¶ 14-20), "[t]o merit consideration by a jury, both of these claims require some evidence of reasonable reliance, that is, that [plaintiff] reasonably relied upon the alleged false representations . . . or that [he] reasonably relied 'on the state of affairs as it appeared in the absence of the suppressed information.'" *Maloof v. John Hancock Life Ins. Co.,* 2010 WL 3797979, *4 (Ala. Sept. 20, 2010) (not yet released for publication).

Peters' alleged misrepresentations, same does not warrant a finding by this Court that there is no possibility the plaintiff can establish a fraudulent misrepresentation or suppression action against Peters since the evidence, at this point in time, supports the contrary reasonable inference that Peters knew that Justice's duties included more than just the physical act of operating on individuals, whether by virtue of common sense and his position as a seasoned insurance agent[18] or because he was one of Justice's patients, yet continued to represent that Provident's "special occupation" disability policy would pay should he be unable to perform as a surgeon. Thus, the issue of "reasonable reliance" is much murkier than Provident would lead this Court to believe and is not one which it should decide (on the merits) in the context of fraudulent joinder.  Indeed, a cursory review of Alabama "insurance" case law turning on "reasonable reliance" reveals that the earliest this issue is decided is at the summary judgment stage, of course long after *all* discovery is completed. *See, e.g., Maloof, supra,* at *1 & 4 ("Harriet Maloof and John A. Maloof, Jr., sued John Hancock Life Insurance Company [] and Parker A. Glasgow, an independent insurance agent, in the Jefferson Circuit Court, alleging fraudulent misrepresentation, suppression, breach of contract, negligent and/or wanton failure to

---

[18]    The undersigned agrees with plaintiff that it is obvious to all that "surgeons do many things other than cut[.]" (Doc. 13, at 2) In fact, it would be amazing indeed if an insurance agent selling "specialty" disability policies to professionals did not readily appreciate that surgeons do more than just cut. The undersigned is of the opinion that all but those with their heads buried in the sand would naturally and commonsensically know that surgeons also see patients in-office both before and after surgery and, as well, treat patients in the hospital both before and after surgery. Accordingly, the undersigned finds compelling plaintiff's argument that a seasoned insurance agent like Peters who was in the business of selling disability policies to professionals would obviously know that surgeons do many things other than cut. (*See* Doc. 13, at 2-5 & 7)

procure insurance, and breach of fiduciary duties arising out of Glasgow's sale of two universal life-insurance policies to the Maloofs in 1989 and 1992. The trial court entered a summary judgment in favor of John Hancock and Glasgow on all the claims, and the Maloofs appeal[.] . . . The Maloofs' fraudulent-misrepresentation and suppression claims were premised on the allegation that Glasgow misrepresented to the Maloofs that the universal-life policies were in their best financial interests and that they would provide funds that would be available to pay the estate taxes due upon John's death, while at the same time suppressing from them the facts that the policies were actually not in their best interests and that benefits from those policies would not be available to pay estate taxes due upon John's death if he lived beyond approximately age 78. . . . In its order granting John Hancock's and Glasgow's motions for summary judgment, the trial court explained its conclusion that evidence of reasonable reliance was lacking[.]"); *AmerUS Life Ins. Co. v. Smith*, 5 So.3d 1200, 1201 & 1216 (Ala. 2008) (in reversing the trial court and rendering a judgment as a matter of law in favor of AmerUS, the Alabama Supreme Court found that "the insureds failed to present substantial evidence [at trial] indicating that Smith's reliance on Jeffrey's representations was reasonable"); *Eskridge, supra,* 823 So.2d at 1258 & 1265 ("We first consider Allstate's argument that the trial court erred in denying its motion for a judgment as a matter of law on Eskridge's fraud claim. . . . Because we conclude that, under the circumstances of this case, Eskridge could not have reasonably relied upon Wamboldt's statement that Eskridge could 'just come back to work' as a basis for his fraud claim, it follows that the trial court erred in denying Allstate's motion for a judgment as a matter of law as to that fraud claim. Accordingly,

the judgment of the trial court must be reversed, and the cause remanded for the entry of a judgment consistent with this opinion."). What Provident is asking this Court to do is to turn the fraudulent joinder standard on its head and rule in its favor on "reasonable reliance" at a stage earlier than any Alabama court has deemed appropriate, all the while ignoring that discovery in this action is far from complete and that the little discovery that has been taken does not clearly and convincingly establish a lack of reasonable reliance by Dr. Justice with respect to Peters' alleged misrepresentations. In other words, the undersigned agrees with plaintiff that Provident is effectively asking this Court to enter summary judgment in its favor (as well as Peters' favor) and thereby improperly subsume a substantive determination of the merits of plaintiff's fraud claims under the veil of a jurisdictional inquiry.

16.    Dr. Justice's fraud claims against Peters are not obviously "frivolous or fraudulent," *Crowe,* 113 F.3d at 1542; instead they are serious and viable. More to the point, because the evidence in this case, including Dr. Justice's deposition, supports the reasonable inference that Peters knew that there was more to Justice's occupation than just operating on patients, whether by virtue of his patient status or by virtue of his position as a seasoned independent insurance agent selling "specialty" disability policies to professionals, and still represented that Provident's "special occupation" disability policy would pay him benefits if he could no longer operate, the undersigned has a reasonable basis for predicting that Alabama law might impose liability on the nondiverse defendant.    In other words, because there is a real possibility that Alabama law might impose liability on Peters under the circumstances alleged in the complaint, as

supplemented by Dr. Justice's deposition testimony, this Court cannot find that joinder of the resident defendant was fraudulent. Therefore, remand of this action is required.

## CONCLUSION

For the reasons set forth above, it is **RECOMMENDED** that plaintiff's motion to remand (Doc. 4) be **GRANTED** and that this action be **REMANDED** to the Circuit Court of Mobile County, Alabama.  Provident's removal of this action is both procedurally and substantively deficient.

The instructions which follow the undersigned's signature   contain important information  regarding objections to the report and recommendation of the Magistrate Judge.

**DONE** this the 8th day of February, 2011.

 s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
FINDINGS CONCERNING NEED FOR TRANSCRIPT**

l.      *Objection*.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to  do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).   The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days[19] after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      *Transcript (applicable Where Proceedings Tape Recorded)*.  Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

---

[19]      Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]" Fed.R.Civ.P. 72(b)(2).